Cynthia RUTAN, et al.,
Plaintiffs–Appellants,

v.

REPUBLICAN PARTY OF ILLINOIS,
et al., Defendants–Appellees.

No. 86–2073.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1987.

Reargued Sept. 27, 1988.

Decided Feb. 16, 1989.

Mary Lee Leahy, Leahy & Leahy, Springfield, Ill., for plaintiffs-appellants.

Thomas P. Sullivan, Jenner & Block, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, CUMMINGS, CUDAHY, POSNER, COFFEY, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.*

MANION, Circuit Judge.

Plaintiffs appeal the district court's dismissal of their complaint challenging a public employer's use of political considerations in hiring, rehiring, transferring and promoting employees. *See Rutan v. Republican Party of Illinois*, 641 F.Supp. 249 (C.D.Ill.1986). We affirm in part, reverse in part, and remand.

## I.

### NATURE OF THE CASE

In their complaint, plaintiffs alleged that Governor James R. Thompson of Illinois, the Republican Party of Illinois, and various state and Republican Party officials use political considerations in hiring, rehiring from layoffs, transferring, and promoting state employees under Governor

Thompson's jurisdiction. Because we are reviewing the district court's dismissal of the complaint for failure to state a claim upon which relief can be granted, we take the allegations in the complaint as true. *See LaSalle National Bank of Chicago v. County of DuPage*, 777 F.2d 377, 379 (7th Cir.1985), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 979 (1986).

According to the detailed complaint, approximately 60,000 state employees work in more than fifty "departments, boards and commissions under the jurisdiction" of Governor Thompson. On November 12, 1980, Governor Thompson issued an executive order "which requires his personal approval or that of a designee before any individual may be hired or promoted." The executive order, which is attached to the complaint, states:

### HIRING FREEZE

Effective at the close of business today, November 12, 1980, no agency, department, bureau, board or commission subject to the control or direction of the Governor shall hire any employee, fill any vacancy, create any new position or take any other action which will result in increases, or the maintenance of present levels, in State employment, including personal service contracts. *All hiring is frozen.* There will be *no* exceptions to this order without my express permission after submission of appropriate requests to my office.

(emphasis in original). Governor Thompson has assigned power over significant employment decisions to the "Governor's Office of Personnel." Plaintiffs contend that the Office of Personnel's employment decisions are

... substantially motivated by political considerations. Such political considerations include whether the individual under consideration is Republican or a relative or friend of a Republican, is sponsored by an influential Republican, is a financial supporter of the Republican party or an influential Republican, is a

---

* Judge Wood, Jr. and Judge Flaum did not participate in the argument or decision in this case.

friend or supporter of defendant Thompson, or is sponsored by those who are friends or supporters of defendant Thompson, or is sponsored by a member of the Illinois General Assembly who is deemed to be a friend or supporter of defendant Thompson.

This patronage employment system, plaintiffs claim, creates a significant political advantage "in favor of the 'ins,' i.e., Defendant James Thompson and his political allies, and against the 'outs,' i.e., those who may wish to challenge him in elections."

The defendants are Governor Thompson, the Illinois Republican Party, seven current or former state officials and two Republican Party officials. Plaintiffs sued two of the state officials as class representatives, one as a representative of all "directors, heads or chief executive officers ... since 1981" of state agencies under the Governor's jurisdiction and the other as a representative of all persons who acted as "liaisons" between those state agencies and the Governor's Office of Personnel. Plaintiffs sued the Republican Party officials as representatives of the class of "all Republican State Central Committee and County Central Committee officials and members ... since February 1, 1981."

Plaintiffs brought this action both as individuals and as representatives of six different classes. These classes are: (1) voters; (2) taxpayers; (3) politically unacceptable employees denied promotions; (4) politically unacceptable employees denied transfers; (5) politically unacceptable employees who have not been rehired after being laid off; and (6) politically unacceptable employment applicants who have applied for but not received a job.

Plaintiff Cynthia Rutan has worked for the Department of Rehabilitative Services since 1974. She has neither been active in the Republican Party nor supported Republican candidates. Since 1981, Rutan has applied for promotion into supervisory positions in the Department of Rehabilitative Services. Defendants allegedly filled each of these supervisory positions with someone less qualified but "favored on a political basis by the Governor's Office of Personnel." Rutan sued on her own behalf and as a class representative of those denied promotions as a result of the patronage system.

Plaintiff Franklin Taylor works for the Department of Transportation. He does not support the Republican Party. In 1983, Taylor applied for a promotion. A less qualified person, whom the Fulton County Republican Party supported, received the promotion. Taylor subsequently requested a transfer to a different county. Taylor was allegedly advised that he was not transferred because the Republican Party chairmen of Fulton and Schuyler Counties opposed the transfer. He sued on his own behalf and as a class representative of those denied promotions and transfers as a result of the patronage system.

Plaintiff Ricky Standefer was hired in a temporary position at the state garage in Springfield in May, 1984. In November of that year he and five other employees were laid off. The five other employees, who had Republican Party support, were offered other state jobs. Standefer, who had voted in the Democratic primary, was not. He sued on his own behalf and as a class representative of those who, as a result of the patronage system, have not been rehired after being laid off.

Plaintiff Dan O'Brien was employed as a "Dietary Manager I" at the Department of Mental Health and Developmental Disabilities' Lincoln Development Center. O'Brien has voted only once in a primary, and that was in a Democratic Party primary. O'Brien was laid off on April 5, 1983. Under the "Rules of the Department of Central Management Services," a laid-off employee can be recalled within two years. If recalled, the employee's benefits continue and he does not lose seniority. In December of 1984, an administrator at the Lincoln Development Center told O'Brien that he would be recalled. The administrator stated, however, that he was waiting to receive the necessary exception to Governor Thompson's hiring freeze. In February of 1985, O'Brien was told that the Governor's Office had denied him an exception to the freeze. "Several months" after being laid

off, O'Brien attempted to and "ultimately" did receive employment with the Department of Corrections. He obtained this job after obtaining the support of the Chairman of the Logan County Republican Party. This job paid less money than his previous job. O'Brien sued on his own behalf and as a class representative of those who, as a result of the patronage system, have not been rehired after being laid off.

Plaintiff James Moore "has sought employment with the State of Illinois particularly with the Department of Corrections" since 1978. In 1980, Moore received a letter from a Republican state representative informing him that he would have to "receive the endorsement of the Republican Party in Polk County before I can refer your name to the Governor's office." Moore alleges that while he was attempting to obtain a position with the State, the son of the chairman of the Polk County Republican Central Committee, the "son-in-law of the Vice-chairman and precinct committeewoman of the Polk County Republican Central Committee," and a Republican precinct committeeman were hired by the State in positions for which Moore was qualified. Moore sued on his own behalf and on behalf of all those denied employment as a result of the patronage system.

Plaintiffs also brought claims as voters and taxpayers. They claimed to represent a class of voters "who are entitled to cast their votes and use the election process to change and influence the direction of government and who have an interest in having a voice in government of equal effectiveness with other voters." They also claimed to represent a class of taxpayers who "are entitled to have monies provided by the taxpayers of Illinois spent only for State purposes and not spent on the operation and maintenance of a State political patronage system." As voters, plaintiffs claimed that the patronage system has diminished the value of their votes, thus denying them "a voice in government of equal effectiveness with other voters." As taxpayers, plaintiffs claimed to have been deprived of tax "monies ... which have been expended for the support of the patronage system and not for a governmental purpose."

Plaintiffs sought relief under numerous federal and state law theories. *See Rutan,* 641 F.Supp. at 252–59. On appeal we are concerned with two: (1) their claims as employees or potential employees that the patronage system violated their rights under the First Amendment as applied to the states through the Fourteenth Amendment; and (2) their claims as voters that the patronage employment system violated the Fourteenth Amendment by denying them equal access and effectiveness in elections.[1] As relief, plaintiffs sought over a billion dollars in damages and transfer of the Governor's control over the state employment system to a federal receiver.

Defendants moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) on the ground that it failed to state a claim for relief. The district court granted defendants' motion. *See Rutan,* 641 F.Supp. 249 (C.D.Ill.1986). This appeal ensued.

## II.

## ANALYSIS

A. *The District Court's Failure to Consider the Class Action Question.*

■ Before addressing the substantive issues raised on this appeal, we must first

---

1. In the portion of their briefs denominated "Statement of Questions" plaintiffs purported to raise an equal protection claim based on their capacities as employees and employment applicants. Plaintiffs' employment claims, however, rise and fall on their First Amendment claims because their arguments in the brief are argued solely under the First Amendment. Whatever its merits, plaintiffs' failure to argue their equal protection claim waived that claim. *See Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir.1986), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987).

Plaintiffs also appeal the district court's decision to dismiss, for lack of pendent jurisdiction, their state law claim brought as taxpayers. Because we remand four plaintiffs' employment claims, the district court should consider on remand whether it should exercise pendent jurisdiction over that claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Any consideration of that claim should also, as with all claims brought in federal court, analyze whether plaintiffs have standing to bring those claims.

address the district court's failure to consider whether plaintiffs may properly bring this case as a class action. The district court dismissed the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted but did not first consider whether the action may be properly brought as a class action. This violates Fed.R.Civ.P. 23(c)(1), which requires the district court to address the issue of class certification "as soon as practicable." *See Hickey v. Duffy*, 827 F.2d 234, 237 (7th Cir.1987); *Bennett v. Tucker*, 827 F.2d 63, 66–67 (7th Cir.1987). The district court's failure to address the class action issue does not deprive us of jurisdiction under 28 U.S.C. § 1291. The district court's order dismissed the suit in its entirety, leaving nothing to be decided in that court. *See Hickey*, 827 F.2d at 238; *see also Gomez v. Illinois State Board of Education*, 811 F.2d 1030, 1034 n. 1 (7th Cir. 1987). Thus, even though the district court should have addressed the class action issue, its failure to do so does not destroy the finality of its decision.

The failure to address the class action issue, however, does limit the scope of our judgment. Because no class of plaintiffs or defendants were certified, only the named plaintiffs and named defendants are before this court. *See Hickey*, 827 F.2d at 238 (citing *Board of School Commissioners v. Jacobs*, 420 U.S. 128, 130, 95 S.Ct. 848, 850, 43 L.Ed.2d 74 (1975)). Therefore, we treat plaintiffs' claims as being brought solely by the named plaintiffs against the named defendants. *See Roberts v. American Airlines, Inc.*, 526 F.2d 757, 762–63 (7th Cir.1975); *see also Pharo v. Smith*, 621 F.2d 656, 663–64 (5th Cir.1980), *modified on other grounds*, 625 F.2d 1226 (5th Cir.1980) (per curiam).

## B. *Patronage Employment Claims*

Plaintiffs' employment claims challenge the validity of a longstanding feature of American politics. Each plaintiff claims that he or she did not receive some favorable employment decisions because political considerations substantially motivated the defendants' employment decisions. Plaintiffs argue that the defendants placed an unconstitutional burden on their freedom of belief and association guaranteed by the First Amendment by relying upon political considerations in making employment decisions. *See Roberts v. United States Jaycees*, 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) ("Freedom of association ... presupposes a freedom not to associate."). On the other hand, defendants argue that the district court properly dismissed plaintiffs' claims because the First Amendment does not require absolute political neutrality by a public employer in making employment decisions. According to defendants, public employer patronage practices violate the First Amendment only if an employee whose party affiliation is not a necessary requirement for his job is discharged or threatened with discharge. Thus, we must resolve two issues in addressing these claims: (1) whether, and to what extent, a public employer may take political affiliation into account in making employment decisions; and (2) whether, under the appropriate substantive rule, the district court properly dismissed plaintiffs' claims.

For years, hiring and retaining public employees rested exclusively within the legislature's and executive's discretion. A public employee's challenge to a particular employment practice that affected his free expression was met with Justice Holmes' famous pronouncement as a member of the Supreme Judicial Court of Massachusetts that, "[a policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 220, 29 N.E. 517 (1892); *see generally Connick v. Myers*, 461 U.S. 138, 143–44, 103 S.Ct. 1684, 1688–89, 75 L.Ed.2d 708 (1983). The latter half of this century has seen employees' rights broadly expand and legislative and executive discretion correspondingly diminish. *See Connick*, 461 U.S. at 143–47, 103 S.Ct. at 1688–90. The Supreme Court has struck down state laws that required public employees to take an oath denying past or present affiliation with the Communist Party, or other "subversive" organizations, *Wieman v. Upde-*

*graff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), as well as laws that barred members of the Communist Party and other "subversive" organizations from state employment, *Keyishian v. Board of Regents,* 385 U.S. 589, 609–10, 87 S.Ct. 675, 687–88, 17 L.Ed.2d 629 (1967). Other cases have firmly established that a public employee may not be discharged for speaking out on matters of public concern. *See, e.g., Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Moreover, retribution short of discharge that is directed at an employee's speech has also been held to violate the First Amendment. *See Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982).

Although broad, public employees' First Amendment rights are not absolute. The First Amendment requires us to balance the employee's interest in free expression against the State's legitimate interests served by the challenged practice. *See Pickering v. Board of Education,* 391 U.S. at 568, 88 S.Ct. at 1734; *cf. Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Thus, discharging an employee whose complaints about the workplace disrupt the workplace and undermine a supervisor's authority does not violate the First Amendment. *See Connick,* 461 U.S. at 150–54, 103 S.Ct. at 1691–94. Similarly, public employer work rules that are legitimately related to the workplace's effective functioning and "not aimed at particular parties, groups or points of view" do not violate the First Amendment even though the rules may negatively affect employees' speech or political association. *See Civil Service Comm'n v. Nat'l Assoc. of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796 (1973) (upholding Hatch Amendment restrictions on political activities by federal employees); *cf. Bart,* 677 F.2d at 624–25 (upholding rule requiring employee-candidate to take leave of absence while campaigning).

There are few areas where the balancing of interests under the First Amendment analysis is more sharply debated, or more uncertain, than the area of political patronage in employment. The Supreme Court first addressed the validity of patronage employment practices in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In *Elrod,* a Democrat succeeded a Republican in the Cook County, Illinois Sheriff's Office. The new sheriff discharged some of the incumbent employees and threatened to discharge others because they were not affiliated with or sponsored by the Democratic Party. A divided Supreme Court held that this practice violated the First Amendment.

Drawing heavily upon *Keyishian* and *Pickering,* a three-justice plurality stated that the patronage dismissals unnecessarily restricted political belief and association and that "any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment of the First Amendment freedoms." 427 U.S. at 372–73, 96 S.Ct. at 2689–90 (plurality). Although generally unimpressed with patronage practices, the plurality did limit its consideration of the issues to patronage dismissals and not to other patronage practices. *Id.* at 353, 96 S.Ct. at 2679 (plurality). Moreover, Justice Stewart's concurrence (in which Justice Blackmun joined) expressly limited the Court's holding to cases where, solely on the basis of political belief, a nonpolicymaking, nonconfidential employee is discharged or threatened with discharge from a job that he is satisfactorily performing. 427 U.S. at 375, 96 S.Ct. at 2690 (Stewart, J. concurring).

The Court next addressed patronage employment in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and slightly modified its holding in *Elrod.* In *Branti,* two Republican assistant public defenders sued after a newly-elected Democratic public defender threatened them with discharge. The Court ruled for the assistants, holding that a public employer cannot discharge an employee based on party affiliation unless "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. at 1295. Again the Court expressly limited its consideration of the issues to patronage dis-

missals. *Id.* at 513 n. 7, 100 S.Ct. at 1292 n. 7.

█ In light of the limited nature of the Supreme Court's holdings in *Branti* and *Elrod*, the courts of appeals generally have hesitated to extend the rule those cases enunciated. In *LaFalce v. Houston*, 712 F.2d 292 (7th Cir.1983), *cert. denied*, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984), this circuit affirmed the dismissal of a complaint filed by a contractor who alleged that a mayor violated the contractor's First Amendment rights by rejecting the contractor's bid for a city contract because the contractor did not support the mayor politically. In reaching its conclusion, the *LaFalce* court balanced the interference with political expression caused by the patronage practice against "the consequences of trying to prevent ... [the interference] through an interpretation of the Constitution." *Id.* at 293–94.

The court first found that a contractor's loss of a particular bid was less disruptive than an employee's loss of a job; a contractor still has other potential contracts to bid on. Moreover, the interference was not likely to affect many businesses, given that most stay on good terms with all major political parties. *Id.* at 294.

The court then determined that the costs of attempting to interfere with the patronage practices outweighed any interference with political affiliations.

> [A]gainst the uncertain benefits of such a rule in promoting the values of the First Amendment must be set the unknown but potentially large costs. To attempt to purge government of politics to the extent implied by an effort to banish partisan influences from public contracting will strike some as idealistic, others as quixotic, still others as undemocratic, but all as formidable. Patronage in one form or another has long been a vital force in American politics. Civil service laws, ... requiring public contracts to be awarded to the low bidder, laws regulating the financing of political campaigns, and decisions such as *Elrod* and *Branti*, have reduced the role of patronage in politics but have not elimi-

nated it entirely. The desirability of reducing it further raises profound questions of political science that exceed judicial competence to answer....

*Id.* The court also expressed concern that public officials would be subject to suit by disappointed bidders each time the city awarded a bid. Finally, the court expressed reluctance to "take so big a step in the face of the Supreme Court's apparent desire to contain the principle of *Elrod* and *Branti*." *Id.* at 294–95; *see also Horn v. Kean*, 796 F.2d 668 (3d Cir.1986) (en banc) (partisan dismissal of motor vehicle agents who were independent contractors, not employees, held not to violate First Amendment); *Sweeney v. Bond*, 669 F.2d 542, 545–46 (8th Cir.) (partisan dismissals of "fee agents" who were independent contractors held not to violate First Amendment), *cert. denied*, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982).

In the employment context, the courts of appeals have extended *Branti* and *Elrod* beyond outright discharges and threats of discharges. For example, the courts have held that partisan decisions not to allow an employee to retain his job after the employee's "official" term of employment expires may violate the First Amendment. *See McConnell v. Adams*, 829 F.2d 1319 (4th Cir.1987); *Furlong v. Gudknecht*, 808 F.2d 233 (3d Cir.1986); *McBee v. Jim Hogg County*, 730 F.2d 1009 (5th Cir.1984). An open question remains, however, over whether burdens imposed by a patronage system rise to the level of a constitutional violation in situations that are not equivalent to the loss of employment.

In *Delong v. United States*, 621 F.2d 618 (4th Cir.1980), the Fourth Circuit limited employees' challenges to patronage practices to those practices that "can be determined to be the substantial equivalent of dismissal." *Id.* at 624. In that case, the plaintiff, a Republican, challenged his transfer and reassignment from his position as State Director of the Farmers Home Administration in Maine to a position as a project assistant in Washington, D.C. The plaintiff had been transferred and reassigned as part of a policy of the Secre-

tary of Agriculture to replace Republican state directors with Democrats.

The district court granted the government summary judgment on the ground that plaintiff's position as a state director was a "policymaking" position. On appeal, the Fourth Circuit reversed and remanded the case to be considered under *Branti*'s newly articulated test: whether "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Delong*, 621 F.2d at 622 n. 2 (quoting *Branti*, 445 U.S. at 519, 100 S.Ct. at 1295). In so holding, the court rejected the government's argument that the patronage assignment and transfer of an employee protected under *Branti* and *Elrod* could never constitute an unconstitutional burden upon an employee's beliefs and associations. The court did, however, limit such challenges to those patronage practices which, while not actual or threatened discharges, could be considered tantamount to a dismissal. *Id.* at 623–24. In pertinent part the court reasoned:

> Dismissal or the threat of dismissal for political patronage reasons is of course the ultimate means of achieving by indirection the impermissible result of a direct command to a government employee to cease exercising protected rights of free political association and speech. This is *Elrod*'s and *Branti*'s specific, narrow application of the principle. We believe that when the principle is applied to patronage practices other than dismissal it is rightly confined to those that can be determined to be the substantial equivalent of dismissal.

In applying the principle, so limited, to the actual or threatened reassignment or transfer of a government employee, the issue thus becomes whether the specific reassignment or transfer does in fact impose upon the employee such a Hobson's choice between resignation and surrender of protected rights as to be tantamount to outright dismissal. This much and no more, we conclude, is a necessary implication from the broader principle drawn upon in *Elrod....* It is obvious that not every reassignment or transfer can fairly be thought to have this quality. It is equally obvious that in practical terms some might.

*Id.*

The "substantial equivalent to a dismissal" standard focuses on the same question presented in constructive discharge cases, that is, whether a particular patronage decision would lead a reasonable person in the plaintiff's position to feel compelled to leave his job. *See, e.g., Parrett v. City of Connersville*, 737 F.2d 690 (7th Cir.1984); *see also Patterson v. Portch*, 853 F.2d 1399, 1405–07 (7th Cir.1988). In the course of most, if not all, people's employment a wide variety of disappointments, and possibly some injustices, occur. Most of these are normal incidents of employment that would not lead a reasonable person to quit. *See Bristow v. The Daily Press, Inc.*, 770 F.2d 1251 (4th Cir.1985) (denial of promotion in and of itself cannot constitute a constructive discharge); *Schaulis v. CTB/McGraw–Hill*, 496 F.Supp. 666 (N.D. Cal.1980) ("An employer has not effected a constructive discharge merely because an employee believes that she has ... limited opportunities for advancement."). However, whether a particular action can be viewed as "substantially equivalent to a dismissal" (or a constructive discharge) is not subject to hard and fast rules. The court must take all the case's circumstances into account.[2] Being placed in a sinecure may be some employee's idea of the ultimate job. For other employees, enforced idleness may be a humiliating experience as well as one that may permanently impair an employee's professional skills. *See Parrett*, 737 F.2d 690. Moreover, there may be special circumstances that

---

**2.** Many constructive discharge cases in the employment discrimination area have required that the employer specifically intend for an employee to resign. *See Bristow*, 770 F.2d 1251, 1255 (4th Cir.1985) (Title VII). This appears to be an open question in this circuit. See *Henn v. National Geographic Society*, 819 F.2d 824, 829 (7th Cir.1987). *Delong* does not place any such requirements in patronage cases, nor do we think it would be appropriate to do so. *Branti, Elrod,* and *Delong* all focus on the burden a patronage system places on an employee, not on the employer's intent to impose the burden.

sharply increase the severity of impact of what might otherwise be viewed as a routine employment decision. Under the *Delong* analysis a court may take all these circumstances into account. *Delong*, 621 F.2d at 624. The ultimate issue remains, however, whether a particular patronage decision "imposed so unfair a choice between continued employment and the exercise of protected beliefs and associations as to be tantamount to the choice imposed by threatened dismissal." *Id.*

In contrast to the Fourth Circuit's analysis in *Delong*, the Third Circuit has recently held that the rule enunciated in *Branti* and *Elrod* extends to any "disciplinary action" by a public employer. In *Bennis v. Gable*, 823 F.2d 723 (3d Cir.1987), a group of police officers brought suit against several defendants. The officers alleged that the defendants demoted them for engaging in political activity, or alternatively, that the defendants demoted them to make room for the new mayor's political supporters. On appeal, the defendants argued that plaintiffs' claims that they were demoted to make room for political support-

ers failed as a matter of law. The defendants contended that the rule enunciated in *Branti* and *Elrod* was strictly limited to patronage discharges and did not extend to practices that placed lesser burdens on plaintiffs' associational interests. The Third Circuit rejected both this argument and the "substantial equivalent to dismissal" standard set forth in *Delong*. *Id.* at 731 n. 9. According to the Third Circuit, the rule enunciated in *Elrod* and *Branti* was not limited by the harshness of a particular action but rather extended to the imposition of any "disciplinary action" imposed for the exercise of First Amendment rights.

*Delong* and *Bennis* enunciate significantly different standards for analyzing patronage claims. *Delong* limits the rule enunciated in *Branti* and *Elrod* to constructive discharges. On the other hand, *Bennis* apparently extends the rule to a wide range of employment decisions, including decisions concerning routine transfers and promotions. We believe the *Delong* analysis is more sound.[3]

**3.** In adopting the *Delong* analysis, we recognize that language in *Hermes v. Hein*, 742 F.2d 350 (7th Cir.1984) indicates that a public employer may never take political factors into account. In *Hermes* two police officers alleged that they were denied promotions because eligibility tests and examination scores were "rigged" to favor other candidates who had local political support. The district court granted summary judgment on the ground that there was no evidence that political affiliations entered into the decision. On appeal, this court stated that "the district court's grant of summary judgment will be sustained if the only reasonable inferences from the record are that [the allegedly politically-favored candidates] would have been promoted regardless of their political affiliations." 742 F.2d at 353. The court then affirmed the grant of summary judgment.

Defendants here distinguish *Hermes* on the ground that *Hermes* involved "rigged" test scores and eligibility lists. We do not find that distinction persuasive. Whatever the effect such conduct may have on other rights, we do not believe the First Amendment issue turns on whether political factors are taken into account in an underhanded manner. Nonetheless, the language in *Hermes* does not control this case. The holding of a previous panel of this circuit is binding on other panels. Dictum is not. *See generally United States v. Crawley*, 837 F.2d 291 (7th Cir.1988). And the language in *Hermes* must be considered dictum. Because of its

summary disposition of the case the panel did not, nor did it need to, test the merits of an extension of *Branti* and *Elrod*. The panel merely cited *Branti* and *Elrod* in a footnote for the undisputed proposition that the right not to associate is protected under the First Amendment. There is no discussion of the reluctance expressed in *LaFalce* to extend *Branti*'s and *Elrod*'s holdings or of the Fourth Circuit's decision in *Delong*. There is also no indication that, on appeal, the defendants challenged any unprecedented expansion of *Elrod*. If the patronage issue was necessary to its holding, the court would have gone into these issues in great detail. Moreover, we note that *Hermes* has not been cited in any patronage case decided by other circuits. Accordingly, because the language contained in *Hermes* is dictum, it does not control this case.

Furthermore, contrary to plaintiffs' suggestion, *Danenberger v. Johnson*, 821 F.2d 361 (7th Cir.1987) does not support the proposition that patronage promotion decisions violate the Constitution. In *Danenberger* the court upheld the dismissal of plaintiff's complaint on the grounds of qualified immunity because no clearly established right to a promotion decision free of any political considerations existed at the time of the challenged promotion decision. *Id.* That the claim was dismissed on qualified immunity grounds in no way implies that such a constitutional right exists, *see Benson v. Allphin*, 786

*Delong* properly extends *Branti*'s and *Elrod*'s protections beyond those decisions' narrow holdings to protect employees from patronage practices that may, as a practical matter, impose the same burden as outright termination. As we explain below, however, the *Delong* analysis also properly takes into account the limited nature of the Court's holdings in *Branti* and *Elrod* and the fact that real differences exist between dismissals and other patronage practices. It also takes into account the substantial intrusion of the federal courts into the political affairs of the States and other branches of the federal government that would necessarily flow from extending *Branti* and *Elrod* beyond constructive discharges.

By favoring political supporters or those who are connected with political supporters, a patronage system will unquestionably have some negative effects on those people who did not support or are not connected with the party or faction in power. The partisan denial of a promotion, transfer, or employment application leaves someone in a possibly lesser position than he would have been absent patronage considerations. At the same time, however, the burden imposed by such patronage decisions is much less significant than losing a job.

While we recognize that in a certain economic sense the failure to win a job may harm a person as much as the failure to keep one, we follow the plurality's approach in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). There the plurality stated that an affirmative action plan's discriminatory effects may be justified when it involves losing future employment opportunity but not when it involves losing a present position. The plurality reasoned that losing an employment opportunity is not as intrusive as losing an existing job. *Wygant*, 476 U.S. at 279–84, 106 S.Ct. at 1849–52 (plurality); *see also Steelworkers v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 840 (1979) ("The [affirma-

tive action] plan does not require the discharge of white workers and their replacement with black hirees."). An employee on the job has an important stake in his position with his employer. His financial affairs and other obligations will be arranged around certain settled expectations that his paychecks will continue. The coercion and control that an employer may exercise over an employee by threat of termination is great. On the other hand, an applicant seeking employment has not arranged his affairs around any expectation of an income stream from the job he seeks. Instead of depriving him of his livelihood, a patronage system lowers his chances for receiving employment at one of many potential employers. If he is employed elsewhere, a rejected application will probably have little effect on his income.

Likewise, absent unusual circumstances, employment decisions not involving dismissals, such as failing to transfer or promote an employee, are significantly less coercive and disruptive than discharges. While a person denied a promotion or transfer will certainly be disappointed and may remain in a lower-paying position, he still retains his job and his ability to meet his financial obligations.

The Sixth Circuit implicitly recognized the distinction between patronage discharges and less burdensome patronage practices in *Avery v. Jennings*, 786 F.2d 233 (6th Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986), which upheld patronage hiring practices against First Amendment attack. The plaintiff in *Avery* unsuccessfully applied for positions in three different county departments controlled by Republicans. The department heads filled vacancies with friends and relatives and with friends and relatives of their political supporters. Of the 432 persons hired in the three departments over a seven-year period, only ten were Democrats. The plaintiff did not receive a job because she was not connected to the patronage network. The three department heads tes-

F.2d 268, 279 n. 26 (7th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986); it means only that either there is no right, or if

there is a right, it was not clearly established at the time at issue.

tified at their depositions that they preferred hiring Republicans. One testified that he "would favor hiring qualified Republicans." Another stated that "All things being equal I prefer to have a Republican working for me because I assume that he will be more interested in taking part in helping me get reelected." The third stated that "It just works better when people have the same philosophy." The district court granted summary judgment to the defendants because, among other reasons, *Elrod* and *Branti* did not extend to politically motivated hirings.

The Sixth Circuit affirmed. The court found that the First Amendment did not forbid a patronage system that relies on family, friends, and political allies for recommendations. While the court stated that a public employer could not bar a person from employment "solely" because of his political affiliation, the employer could rely on political factors in making decisions. The Sixth Circuit reasoned that the challenged patronage system was markedly different from public employer actions that the Supreme Court had declared unconstitutional. The challenged patronage system had many legitimate purposes such as finding good employees, extending political and personal friendships, and enhancing the official's performance and political appeal. Moreover, the court noted that any rule forbidding an employer from considering political affiliation in hiring would require invalidating hiring practices in public offices nationwide.

When balanced against the more limited burdens imposed by patronage practices other than dismissing or constructively discharging an employee, other interests strongly weigh against broadly expanding the rule *Branti* and *Elrod* enunciated. In a representative government, courts must afford the political process and political institutions great deference. Extending *Branti* and *Elrod* to virtually all employment decisions would raise profound questions concerning democratic institutions that this court has previously found beyond our competence to answer. *See LaFalce*, 712 F.2d at 294.

Moreover, using political considerations in employment decisions is as old as this country. Although the age of a particular practice does not immunize it from constitutional challenge, *see, e.g., Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), "[i]f a thing has been practiced for two hundred years, it will need a strong case for the Fourteenth Amendment to effect it." *Jackman v. Rosenbaum*, 260 U.S. 22, 43 S.Ct. 9, 67 L.Ed. 107 (1922) (Holmes, J.). Thus, it is not irrelevant to our inquiry that George Washington and Thomas Jefferson were no strangers to either patronage hiring or the First Amendment. *See Elrod*, 427 U.S. at 377–78, 96 S.Ct. at 2691–92 (Powell, J., dissenting). The more widespread use of patronage, beginning with Andrew Jackson and extending to modern times, has been credited with increasing the level of participation in American politics. *Id.* at 377–80, 96 S.Ct. at 2691–93. By increasing the level of participation in American politics, patronage has also been credited with adding balance and stability to government. *Id.; see also Branti*, 445 U.S. at 526–32, 100 S.Ct. at 1298–1302 (Powell, J., dissenting). As Justice Powell has stated in support of patronage practices, even when they included termination:

> Broad-based political parties supply an essential coherence and flexibility to the American political scene. They serve as coalitions of different interests that combine to seek national goals. The decline of party strength inevitably will enhance the influence of special interest groups whose only concern all too often is how a political candidate votes on a single issue. The quality of political debate, and indeed the capacity of government to function in the national interest, suffer when candidates and officeholders are forced to be more responsive to the narrow concerns of unrepresentative special interest groups than to over-arching issues of domestic and foreign policy."

*Branti*, 445 U.S. at 532, 100 S.Ct. at 1301 (Powell, J., dissenting).

Finally, we note that the practical considerations that this court relied on in *LaFalce* are even more compelling in this case.

Recognizing the rights asserted by plaintiffs in this case would potentially subject public officials to lawsuits every time they make an employment decision. We doubt that there is a single disappointed employee who could not point to political disagreement, or simply lack of agreement between himself and a hiring official or the person who received the desired position. Political issues and beliefs do not come in neat packages wrapped "Democratic" and "Republican." A wide variety of issues, interests, factions, parties, and personalities shape political debate. Moreover, it is questionable whether "politics" could be meaningfully separated from other considerations such as friendships, compatibility, and the enthusiasm to pursue the stated job goals. The Supreme Court has shown great reluctance to have the federal courts preside as a platonic guardian over state employment systems. *See Bishop v. Wood*, 426 U.S. 341, 349, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976) ("Federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies."); *Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983) ("[G]overnment offices could not function if every employment decision became a constitutional matter."). By asking that we review virtually every significant employment decision for absolute political neutrality, plaintiffs essentially ask that we constitutionalize civil service and then preside over the system. This would be an unprecedented intrusion into the political affairs of the states and other branches of federal government. In the absence of a clear indication from the Supreme Court, we will not take such a large step.

In sum, we believe *Delong*'s analysis provides the appropriate inquiry in patronage cases involving practices other than the actual or threatened dismissal from employment. In the political world in which democratic institutions exist, courts should not interfere unless compelling reasons exist for doing so. Banning political considerations from all public service employment decisions, even if practical, would diminish the political will of the voters, insert courts into disputes between political factions, and stifle the ability of elected officials to govern. These public policy questions, rife with serious concerns over federalism and—in the case of federal employment—separation of powers, are best left in the political arena.[4]

Having determined the appropriate analysis to apply to plaintiffs' claims, we must next determine whether, under that analysis, the district court properly dismissed those claims. Under Fed.R.Civ.P. 12(b)(6), a court may not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts to support his claims that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In making this determination, a court must resolve all reasonable inferences in the plaintiff's favor. *See Hanrahan v. Lane*, 747 F.2d 1137, 1139 (7th Cir.1984). In light of the appropriate analysis and the stringent standards for Rule 12(b)(6) dismissals, we reverse the district court's decision to dismiss Standefer's, O'Brien's, Rutan's, and Taylor's claims, and affirm the decision to dismiss Moore's claim.

■ Moore alleges that he applied for jobs that were awarded to less qualified but politically favored persons. The district court correctly dismissed this claim. As we explained above, rejecting an employment application does not impose a hardship upon an employee comparable to the loss of job. *See Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1984) (plurality opinion); *see also Avery v. Jennings*, 786

---

4. All this is not to say that retaliatory harassment falling short of actual or constructive discharge is not actionable. We held in *Bart v. Telford*, 677 F.2d 622 (7th Cir.1982), that even an act of retaliation as trivial as failing to hold a birthday party for a public employee could be actionable when intended to punish her for exercising her free speech rights. However, acts of retaliation must be distinguished from favored treatment of political supporters that has the incidental effect of making a nonsupporter no better off.

F.2d 233 (6th Cir.1986).[5] Failing to obtain a particular position disappoints, but no more so than the plaintiff's failing to obtain employment in *Avery*, 786 F.2d at 236–37, the contractor's failing to obtain a contract in *LaFalce*, 712 F.2d at 294, or the independent contractors losing their working relationships with the state in *Horn v. Kean*, 796 F.2d at 674–75, and *Sweeney*, 669 F.2d at 545–46. Any burden imposed on an employment applicant does not outweigh the significant intrusion into state government required to remedy such a claim. While the wisdom of patronage hiring practices is certainly open to debate, the validity of such practices is something more appropriately addressed to the legislature than the courts.

▪ Rutan's and Taylor's claims are more problematic than an employment applicant's claims. Rutan alleges that she has been denied promotions that went to less qualified but politically favored persons. Taylor alleges that he has been denied a promotion that went to a less qualified but politically favored person. He also alleges that he was denied a transfer because he did not have the support of the Republican Party chairmen in Fulton and Schuyler Counties. Although a close question, we believe the district court erred in dismissing those claims.

If we were reviewing this case after trial and the facts pled in the complaint constituted the only evidence in the record, we would affirm the district court's judgment. As discussed above, merely failing to transfer or promote an employee is significantly less coercive or disruptive than discharging an employee. However, dismissing a complaint under Fed.R.Civ.P. 12(b)(6) is proper only if it appears beyond doubt that a plaintiff can prove no facts to support his claim. While it may be highly unlikely that a person who is merely denied a transfer or promotion can prove that the decision was the substantial equivalent of a dismissal, we cannot make this determination as a matter of law based on the minimal facts contained in the complaint. We are particularly reluctant to scrutinize the pleadings under freshly articulated standards. Whether a particular employment action is equivalent to a dismissal rests upon each case's facts and circumstances. *Cf. Clark v. Marsh*, 665 F.2d 1168 (D.C.Cir.1981) (upholding finding of constructive discharge when aggravating circumstances led an employee to retire after being denied a promotion). If Rutan and Taylor can assert that some special circumstances present in their cases would have led a reasonable person to quit, they should be permitted to pursue any such claim.

We also note that both Rutan and Taylor appear to have remained in their positions after the challenged employment decision. This is certainly relevant in determining the severity of the impact of the challenged patronage decision but does not as a matter of law prevent Rutan and Taylor from proceeding with their claims. We agree with the position implicit in *Delong* that a first amendment violation occurs when the burden placed upon a particular employee is

**5.** In *Avery v. Jennings*, 786 F.2d 233 (6th Cir. 1986), the Sixth Circuit indicated in dictum that hiring decisions based "solely" on party affiliation would violate the First Amendment. When faced with that dictum a two-member majority of another Sixth Circuit panel "reluctantly" reversed a district court's decision to dismiss a complaint in which a plaintiff alleged that a hiring decision was based "solely" on political considerations. *Messer v. Curci*, No. 85–5626 (6th Cir. Dec. 2, 1986) (available on Lexis), *vacated and rehearing en banc granted*, No. 85–5626 (6th Cir. Jan. 21, 1987) (available on Lexis) [available on WESTLAW]. The majority believed the complaint failed to state a claim but decided for prudential reasons to follow *Avery*'s dictum. The third member of the panel dissented on the ground that the panel was not bound by the dictum and that the complaint failed to state a claim.

We agree with the panel in *Messer v. Curci* that it should not matter whether the complaint alleges that patronage was the "sole reason" or a "motivating reason." We do not believe the fact that Democrats filled 10 out of 422 available slots was dispositive on the issue of whether political factors may be taken into account by a public employer. *Avery* added this dictum to reconcile its holding with the Supreme Court's holdings in *Keyishian* and *Wieman* invalidating state laws banning Communists and other "subversives" from employment. These cases, however, are not controlling in the patronage area. Under the *Branti* and *Elrod* balancing test a completely different set of factors are involved in patronage cases.

substantially equivalent to a discharge. An employee could stay on the job and withstand very difficult circumstances that might cause others similarly situated to quit. Financial circumstances may not allow the person the luxury of resigning before finding other employment. That circumstances prevent an employee from resigning does not decrease the burden the employer has, in fact, placed upon him.

We emphasize that the issue is not whether partisan reasons entered into a particular employment decision. Rather, the issue is whether a partisan decision imposed such a burden upon a particular employee that it would have led a reasonable employee to quit. There are a wide variety of employment decisions made every day that result in disappointment to employees. For every person promoted there are several others who wish they had been. Federal court is not intended to be the final arbiter for every real or imagined slight claimed by disappointed employees. It is only when a particular patronage practice could *reasonably* be thought to be the substantial equivalent of a dismissal that such a practice violates the First Amendment.

■ Standefer's and O'Brien's claims are more straightforward. Standefer alleges that he was laid off from a "temporary position" at the state garage in Springfield along with five other employees. The five other employees, who had the Republican Party's support were offered other state jobs. Standefer was not. Resolving all reasonable inferences from these facts in Standefer's favor, these allegations may support a claim that a public employer conditioned Standefer's continued employment with the State upon Standefer's political affiliation. This is the type of conduct found constitutionally impermissible in *Branti* and *Elrod*.

This is not to say that a laid-off employee is automatically entitled to be considered for other positions with the State, or even his old position, without patronage considerations being taken into account. Failing to rehire after layoff does not in and of itself violate the rule enunciated in *Elrod* and *Branti*. Many laid-off employees will stand essentially in the position of new job applicants when they seek a position. But not all employees will be in that position. If a formal or informal system exists for placing employees into other positions, that system must not include partisan political considerations that cause an employee to lose his employment with the state.

On remand, the court must consider all the facts and circumstances of Standefer's case with the ultimate inquiry being whether a politically motivated failure to place Standefer in another position was the substantial equivalent of a termination from employment. In making this determination, we believe that several facts deserve special consideration. The district court should consider: whether the employment relationship was considered to be "temporary" rather than "permanent"; whether the "layoff" was merely the end of a temporary position or whether it was a true layoff; whether employees had reasonable expectations of placement into other job positions upon layoff; whether the previous employment with the State was simply a minor factor considered with many others in an *ad hoc* process or whether it was essentially determinative in being placed in the new position; and, whether there was a substantial time lapse between the layoff and placement of other employees or whether the placement into other positions was made contemporaneously with the layoff. Although we have listed these facts, we do not purport to delineate every possible factor or the weight given to each factor. Rather, as stated above, the court must look at all the facts and circumstances with an eye towards ultimately determining whether failing to place Standefer in a position after layoff was substantially equivalent to firing him.

O'Brien alleges that he was laid off from a position at the Lincoln Development Center. He does not allege that he had any specific right to recall. But he does allege that, under the Center's policies, he could be recalled within two years, and if recalled, there would be no break in his seniority and other benefits. "Several

months" after being laid off he received a position with the Department of Corrections in which he had no accrued seniority or benefits. In February of 1985 (apparently after he was working at the Department of Corrections), he was told by an administrator at the Center that he would be rehired if the Center received an exception to the "Hiring freeze." The Governor's office denied the request for an exception.

Laying off an employee suspends the employee's working relationship with an employer but does not usually terminate the relationship. Absent indications that an employee's layoff is "permanent," a layoff will typically involve some formal or informal expectation of being placed back in the position if, within some specified or reasonable time period, the job becomes open once again. A person who has ordered his life around a particular job, built up experience and seniority in the position, and has a reasonable expectation of being recalled to that position stands in far different position than an employment applicant. After a layoff, a recall to the same job conditioned upon an employee's political affiliation is the type of inherently coercive conduct that *Branti* and *Elrod* found to violate the First Amendment.

There are some factors in O'Brien's case that take it beyond a straight failure to recall from layoff case. First, O'Brien does not allege that there was a general recall that he was left out of because he was not a Republican supporter. In fact, he does not even allege that his position was filled by anyone within the two-year recall period. Absent these facts he may have a difficult time proving his claims. Nonetheless, the allegation in the complaint that, absent political considerations, he would have been granted an "exception" to the "hiring freeze," and thus been reinstated into his job, is sufficient to state a claim for relief.

Second, O'Brien apparently held a position with the Corrections Department at the time he was denied an exception to the "hiring freeze." Thus, the alleged patronage system did not deny him employment altogether. Nonetheless, as discussed earlier, the fact that a person is on the state payroll does not automatically render the claim insufficient as a matter of law.

In sum, we affirm the district court's decision dismissing Moore's claim. We reverse the district court's decision dismissing the other plaintiffs' employment claims and remand for further proceedings consistent with this opinion.[6]

## C. *Voter Challenges to Patronage Practices—Standing.*

■ Besides challenging the alleged patronage system as employees, plaintiffs, as voters, also claim that the patronage system deprived them of "equal access and effectiveness of elections." Plaintiffs allege that the patronage system gives Governor Thompson and his supporters a significant advantage over their opposition in elections. The district court never reached the merits of this claim on the ground that the plaintiffs lacked standing. We agree.

In *Shakman v. Dunne*, 829 F.2d 1387 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1026, 98 L.Ed.2d 991 (1988), this circuit analyzed the standing requirement as applied to claims by candidates and voters challenging patronage hiring practices in Cook County, Illinois. In *Shakman*, the candidates and voters claimed that patronage hiring had the "purpose and effect" of giving incumbent Democratic officials a significant advantage in communicating with the electorate. The court rejected plaintiffs' claims, holding that the candidates and voters had no standing to chal-

---

**6.** On remand the district court should also "as soon as practicable" consider whether the individual employees' claims may properly be brought as a class action. Fed.R.Civ.P. 23(c). In view of the individualized determinations necessary to resolve the claims, the district court should carefully scrutinize the claims before deciding to certify any class. *See generally* *General Telephone Co. v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

We also note that defendants have argued on appeal that they are entitled to qualified immunity from damages. Such a request is more appropriately addressed to the district court on remand.

lenge patronage hiring. In finding that the plaintiffs lacked standing, the court reasoned that the chain of causation between the challenged governmental activity and the alleged injury was too tenuous:

[W]e find the line of causation between the appellant's activity and the appellee's asserted injury to be particularly attenuated.... [T]he line of causation depends upon countless individual decisions. Moreover, those countless individual decisions must depend upon ... countless individual political assessments that those who are in power will stay in power. It is not the hiring policy itself which creates any advantage for the incumbents. Any other candidate is entirely free to assert that, if elected, he will follow the same policy. Any advantage obtained by the incumbent is obtained only if the potential workers make an independent evaluation that the incumbent, and not the opposition, will win. The plaintiffs will be at a disadvantage if—and only if—a significant number of individuals seeking political job opportunities determines the 'ins' will remain the 'ins.'

*Id.* at 1397. The court also noted that so many factors, many not even capable of articulation, determine a person's political activity that the plaintiffs could not say that their alleged injuries were "fairly traceable" to the defendant. *Id.; see also Winpisinger v. Watson,* 628 F.2d 133, 139 (D.C.Cir.), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980) (no standing for supporters of President Carter's primary opponent to challenge Carter Administration award of 275,000 census jobs allegedly conferred on a political patronage basis).

Here, plaintiffs' standing argument is no different from that rejected in *Shakman.* In fact, plaintiffs made clear that their claims are virtually the same claims the district court held sufficient to confer standing in *Shakman* (which was reversed after oral argument in this case). *See Shakman v. Democratic Organization of Cook County,* 481 F.Supp. 1315 (N.D.Ill. 1979), *rev'd in relevant part,* 829 F.2d 1387 (7th Cir.1987). Like the plaintiffs in *Shakman,* plaintiffs contend that patron-

age has created an advantage in favor of the incumbents.

This does not confer standing on voters. The causal link between any "loss" in their votes' impact and the challenged actions is too tenuous. Indeed, plaintiffs' statewide challenge presents a more tenuous causal relationship than the challenge mounted by voters *and* candidates in *Shakman* to patronage hiring in a single county. Because the injury asserted in the complaint is not fairly traceable to the challenged action, the district court properly dismissed plaintiffs' claims as voters for lack of standing.

Each side shall bear its own costs.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

With respect to the patronage hiring claim of James Moore, I agree with the result reached by the majority though not necessarily with all the reasoning. It seems to me that removing politics from the dispensation of government jobs is too daunting a task even for such all-purpose problem-solvers as the federal courts. At least the task should not be undertaken without some clearer signal from the Supreme Court. How to square this conclusion with the extensive first amendment jurisprudence which has grown up around political *discharges* is an even more daunting challenge, although *LaFalce v. Houston,* 712 F.2d 292 (7th Cir.1983), *cert. denied,* 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984), may point the way—at least for the time being. Patronage hiring practices are of great antiquity. There may be *some* good in them in *some* circumstances but, most importantly, rooting them out is something the federal courts could not accomplish without incurring staggering and, I should think, clearly disproportionate costs. The patronage hiring practices involved here seem unvarnished and redolent of another era. They could, however, be dealt with by a properly designed civil service system. This is not a job for the federal courts—*yet.*

With respect to unfavorable personnel actions falling short of discharge involving

existing employees, I agree with Judge Ripple and would rely on his persuasive partial dissent to the original panel opinion, 848 F.2d 1396, 1412 (7th Cir.1988), as well as on his separate opinion here. It strikes me also as unrealistic to require plaintiffs to show that they were treated badly enough to quit, but for some reason did not. I would also follow *Bennis v. Gable,* 823 F.2d 723 (3d Cir.1987) (extending *Elrod* to any "disciplinary action" imposed for the exercise of first amendment rights), rather than *Delong v. United States,* 621 F.2d 618 (4th Cir.1980) (limiting *Elrod* to actions "substantially equivalent to dismissal"). We are already deeply into the business of protecting the first amendment rights of those who are already public employees and here I think we should follow the logic of our cases rather than attempt to draw the line quite unrealistically at constructive discharges.

For all these reasons I respectfully dissent to the extent indicated.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

In this bobtailed[1] en banc proceeding, the majority has filed essentially the same opinion that was filed by the majority in the original panel's consideration of this matter. *Rutan v. Republican Party of Illinois,* 848 F.2d 1396 (7th Cir.1988). I shall rely therefore on the separate opinion I filed when the case was before the panel. *Id.* at 1412. I note only that, with the Second Circuit's decision in *Lieberman v. Reisman,* 857 F.2d 896 (2d Cir.1988), the division among the circuits appears to deepen. Apparently, government workers in Hartford, New York, Philadelphia, Pittsburgh, and Atlanta can expect protection when a local politician makes life uncomfortable because they do not knuckle under to his political will—even though politics has nothing to do with their jobs. In Chicago, and perhaps Richmond, the watchword is "politics as usual."

The need for Supreme Court review of this important question is evident. Ameri-

can citizens serving their country in state and local government ought not have their legal protection depend on the accident of where Congress decided to draw the administrative line separating one circuit from another. Review on certiorari is particularly appropriate in this case because the majority's reasoning depends, to a great extent, on its disagreement with the governing precedent of the Supreme Court. *See* Supreme Court Rule 17.1(c) (certiorari appropriate "[w]hen ... a federal court of appeals ... has decided a federal question in a way in conflict with applicable decisions of this Court"). It may be that the majority has perceived correctly the winds of change. But change must come from the Supreme Court, not a regional court of appeals. For us, stare decisis must be the governing principle.

**1.** *See North Georgia Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 615, 95 S.Ct. 719, 726, 42 L.Ed.2d 751 (1975) (Blackmun, J., dissenting).