Thomas WHITE, et al.,
Plaintiffs-Appellants,

v.

Richard J. ELROD and Phillip Hardiman, Defendants-Appellees.

No. 85–2267.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1986.

Decided April 8, 1987.

Ronald S. Samuels, Washington Kennon Hunter & Samuels, Chicago, Ill., for plaintiffs-appellants.

Leonard N. Foster, Asst. State's Atty., Chicago, Ill., for defendants-appellees.

Before CUDAHY and POSNER, Circuit Judges, and KANNE, District Judge.*

POSNER, Circuit Judge.

This appeal by jail guards from a decision by the district court dismissing their civil rights suit under 42 U.S.C. § 1983 grows out of an illegal strike in 1980. The guards were employed by the Cook County Corrections Department, which is under the jurisdiction of the Sheriff of Cook County. At the time this was Richard Elrod. The department's director was Phillip Hardiman. Hardiman and about 90 percent of the department's staff were black. The jail guards, who made up the bulk of the staff, were angry because they were paid less than deputy sheriffs, who are also under the jurisdiction of the sheriff but do not work in the corrections department. A much higher fraction of guards than of deputy sheriffs was black, and many of the blacks felt that the disparity in wages reflected racial prejudice. When the department refused to raise the wages of the jail guards, a number of them organized a "sick out" or "blue flu" work stoppage. For 10 days, more than 85 percent of the 900 guards called in sick, and during this period the 5,000 inmates of the Cook County Jail were inadequately guarded. Hardiman and Elrod wanted to fire all the strikers, but they realized that if they did so the security problem in the jail would become catastrophic before replacements for the fired guards could be hired and trained. So they decided to fire just those guards who had organized or "exacerbated" the strike. They sent letters to 34 guards, most of whom were black (at least two, and maybe more, were white, however), suspending them for "desertion of post to the jeopardy of security" until the Cook County Police and Corrections Merit Review Board determined the merit of this charge. The work stoppage ended.

Twenty-two of the 34 guards who had been suspended brought this suit against Elrod and Hardiman. They charged that the suspensions constituted selective prosecution in violation of the equal protection clause, had been racially motivated (and hence violated the equal protection clause in an additional sense), and had been in retaliation for the plaintiffs' exercise of their free speech. Sixteen of the original plaintiffs remain, the others having defaulted along the way. Two of the 16 were reinstated by the Merit Board with back pay, the Board having dismissed the

* Hon. Michael S. Kanne of the Northern District of Indiana, sitting by designation.

charges against them. Two others pleaded guilty before the Board and were reinstated without back pay.

Eventually this case was tried. Meanwhile, 11 of the 16 remaining plaintiffs, having failed to obtain reinstatement, had appealed the Merit Board's action to the Circuit Court of Cook County, which reversed. (The sixteenth plaintiff had also been found guilty by the Board, but he did not seek judicial review.) The Illinois Appellate Court, however, reversed the circuit court and reinstated the Merit Board's decision. The appellate court's decision was handed down after the bench trial in the present case was over and while the district judge was preparing his findings of fact and conclusions of law. The defendants showed the decision to the judge, and he held that the present suit was barred by res judicata, and ordered the complaint dismissed.

 The ground of decision is questionable with regard to the two plaintiffs who prevailed before the Merit Board. The defendants point out that the Board rejected all of the plaintiffs' constitutional claims, and they argue that this rejection should preclude these two plaintiffs as well as the others from raising the claims in this suit, even though the Board dismissed the defendants' charges against these two. There are two replies to this argument. The first, well established in Illinois law but rather question-begging, is that a finding that is not essential to the judgment has no collateral estoppel effect. *Decatur Housing Authority ex rel. Harlan E. Moore & Co. v. Christy-Foltz, Inc.*, 117 Ill.App.3d 1077, 1082, 73 Ill.Dec. 519, 523, 454 N.E.2d 379, 383 (1983). A finding rejecting the plaintiffs' constitutional claims was not essential to a judgment reinstating them. The second reply, more functional but not the subject of a reported Illinois case, is that when a decision of a tribunal of first instance is subject to appeal, the decision cannot be given collateral estoppel (or res judicata) effect if the party sought to be bound could not have appealed it, for example because he had won. See 1B Moore's Federal Practice ¶ 0.416[1], at p.

515 (2d ed. 1984); 18 Wright, Miller & Cooper, Federal Practice and Procedure §§ 4421, 4433 (1981). The idea is that the finding is not sufficiently reliable, without the opportunity for appellate review of it, to be made incontestable in a subsequent suit.

 Either principle would defeat the defendants' argument, except that the Merit Board apparently did not give the two plaintiffs whom it reinstated complete relief, and presumably they could have appealed from this partially adverse outcome. The record does not make clear whether the shortfall was trivial, in which event we don't suppose the failure to appeal could be thought important on the question of collateral estoppel, or significant, in which event it would be important; a party should not be allowed to pocket the favorable part of the decision and bring a fresh suit to upset the unfavorable part. In view of these doubts, and our confidence about an alternative ground (of which more later) for upholding the district court's decision, we decline to apply collateral estoppel to these two plaintiffs.

 Their ground for resisting collateral estoppel is not, however, available to any of the other plaintiffs, including the two who pleaded guilty and were then reinstated. By pleading guilty they waived any right to challenge their guilt on appeal. Their situation is the same as that of parties who, having a right of appeal, allow the deadline for appealing to expire without filing an appeal. The judgment of the trial court in such a case has the same preclusive effect as if it had been affirmed.

The other plaintiffs were able to appeal and all but one did, but they argue that they were forbidden to introduce evidence of their constitutional claims before the Merit Board. It is true that the Board took the position that it need not and would not consider those claims. Nevertheless, in appealing to the circuit court the plaintiffs argued both the selective-prosecution and free-speech claims, and they continued to do so in the appellate court, which expressly rejected both claims. Neither decision

refers to the remaining constitutional claim (racial discrimination).

We can find no basis in Illinois law for the Merit Board's refusal to consider the plaintiffs' federal constitutional grounds for reinstatement. The statute under which the Board operated provides that a correctional officer may not be fired except for cause, after written charges have been filed by the Sheriff of Cook County and after an opportunity for a hearing at which the officer is entitled to a "full opportunity to be heard ... and produce proof in his defense." Ill.Ann.Stat. ch. 125, § 62. It would violate the supremacy clause for the Board to take the position that the exercise of federal constitutional rights is "cause" for being fired; nor does anyone suggest that this is the Board's position. If a fired employee contends that the sheriff fired him not for cause but for reasons forbidden by the U.S. Constitution, nothing in any statute or case law of Illinois suggests that the Board cannot hear evidence in support of the contention, and the statutory language quoted above suggests it can, as does *Green v. Board of Fire & Police Comm'rs*, 87 Ill.App.3d 183, 188, 42 Ill.Dec. 478, 482, 408 N.E.2d 1187, 1191 (1980), and *Fox v. Civil Service Comm'n*, 66 Ill.App.3d 381, 392, 23 Ill.Dec. 174, 181, 383 N.E.2d 1201, 1208 (1978). It seems, then, that the Board made a mistake of state law in refusing to consider the plaintiffs' constitutional claims; and for such a mistake the remedy is an appeal to the state courts.

This is not a case like *Jones v. City of Alton*, 757 F.2d 878 (7th Cir.1985), where a local civil service commission held that a police officer's claim that he had been fired because of his race was irrelevant to whether he should be fired for shoplifting—and the circuit and appellate courts agreed, so that the officer could get no hearing in the state system on his constitutional claim. If the plaintiffs in this case had asked the Illinois courts for a remand to enable the Board to determine their constitutional defenses and the courts had refused, this case would be like *Jones.* But the plaintiffs didn't do this. Instead they asked the courts to decide their constitutional claims on the basis of the record compiled before the Board. They apparently believed that, despite its unwillingness to consider those claims, the Board had let in enough evidence to establish their merit. Certainly the courts did not think themselves barred from considering these claims. The circuit court reversed on the ground of improper selective prosecution, and the appellate court reversed the circuit court on the ground that selective prosecution is not unconstitutional and that the plaintiffs had no First Amendment right to engage in an illegal strike. (The plaintiffs do not argue that the strike was legal under Illinois law; a wildcat strike by jail guards is the quintessence of illegal strike activity.) The plaintiffs had a full hearing on their constitutional claims before courts of competent jurisdiction in Illinois, and lost on the merits. That judgment is a bar to their proceeding on the same claims, or claims arising from the same facts, in federal court. All that was missing was an initial decision by the Board on those claims—a lack that the plaintiffs could have complained of in the Illinois courts but decided not to.

This, however, does not dispose of the two plaintiffs who won their cases before the Merit Board.

■ Before the district judge got around to discussing res judicata, he devoted 27 pages of his opinion to a review of the plaintiffs' claims on the merits, rejecting every one and concluding that "the evidence adduced at trial supports the choice the defendants made, and justifies the entry of judgment for them." He apparently thought, however, that if the suit was barred by res judicata, the appropriate disposition was not to enter judgment for the defendants but to dismiss the complaint. This was an error. Res judicata is a defense like any other—it is not jurisdictional —and, if it is proved, the defendants are entitled to judgment on the merits. The judge wasn't required to drop the substantive issues as soon as he discovered that the defendants had a good res judicata defense.

■ But we need not stand on ceremony. The judge made clear that he thought the defendants were entitled to judgment because the plaintiffs had failed to prove any violations of federal law. If he was right, it would be futile to remand the case to permit him to change the judgment from dismissal of the complaint for want of jurisdiction to judgment for defendants on the merits. We can do it ourselves, provided that the findings of fact which he made are not clearly erroneous and establish that there was no violation of federal law.

■ The two plaintiffs whose claims are not barred by res judicata failed to prove racial discrimination. Most of the staff of the corrections department was black, the director was black, and 90 percent of the ringleaders were black, because part of the gripe about the difference in pay between the guards and the deputy sheriffs was that a much higher proportion of deputy sheriffs than guards was white. So it was highly likely, quite apart from any racial animus against black guards, that the vast majority of the suspended guards would be black. The plaintiffs point to two white guards who were not suspended and who they say also "exacerbated" the strike, but the district judge was not required to infer from this discrepancy that the suspension of the plaintiffs was racially motivated.

■ The plaintiffs' claim that their suspension was a species of selective in the sense of arbitrary prosecution (for besides and as a concomitant of suspending them the defendants lodged charges against the plaintiffs with the Merit Board) both undermines their claims that the suspensions were motivated by racial animus or retaliatory intent and lacks constitutional significance. Almost all prosecution is incomplete and to a degree arbitrary, the virtually random ticketing of speeders being merely the most familiar example. American governments do not have the will or resources to prosecute all malefactors, and unless the choice of whom to prosecute is based on invidious grounds such as race or the exercise of free speech there is no constitutional violation. *Wayte v. United States*, 470 U.S. 598, 608–10, 105 S.Ct. 1524, 1531–32, 84 L.Ed.2d 547 (1985); *Ustrak v. Fairman*, 781 F.2d 573, 575 (7th Cir.1986); *Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir.1985). Here, as a matter of fact, the argument for selective prosecution was overwhelming: if the defendants suspended all the strikers, the Cook County Jail would be unmanageable; by suspending the ringleaders and other "exacerbators" the defendants hoped, successfully in the event, to paralyze the body by removing the head. No doubt in picking out 34 to suspend, the defendants overlooked others equally culpable, but circumstances did not permit and the United States Constitution did not require a finer discrimination than was attempted.

■ Finally, a law violator cannot buy immunity from prosecution by coupling his violation with advocacy and then complaining that his advocacy led the government to single him out to prosecute for the violation—even if his speculation about the government's motive is true. *Wayte v. United States, supra*, 470 U.S. at 611–14, 105 S.Ct. at 1533–34. The government is allowed to get a bigger bang for its buck by concentrating its limited resources on those who flaunt their offenses, since proceedings against them are apt to generate more publicity and therefore communicate a more effective deterrent than proceedings against the obscure and denying violator. That is (so far as appears) all that happened here. A further point is that organizing and exacerbating a strike by urging others on is difficult in practice to distinguish from urging redress of the real or imagined grievances that provide the occasion or pretext for the strike. It is natural that the leaders should be most vocal in proclaiming the abuses that they say prompted them to act, but as we have said this cannot buy them immunity from prosecution. There is no evidence that anyone was fired who merely advocated a higher wage and did not also urge or assist the strike; the closest to such a person is Adolphus Bailey, who did not picket—but he did call in sick, and as president of the local police union his participation in the strike undoubtedly assisted it. There is

also no evidence that any ringleader or "exacerbator" was fired because of his ideas rather than his conduct.

As modified in accordance with this opinion, the judgment of the district court is AFFIRMED.