Raymond GAMBOA, Plaintiff,

v.

Harold WASHINGTON,[1] et al.,
Defendants.

No. 86 C 9161.

United States District Court,
N.D. Illinois, E.D.

June 27, 1989.

1. On June 16, 1988, Mayor Eugene Sawyer was substituted for defendant Harold Washington in his official capacity, and Roy Washington as administrator of the estate of Harold Washington was substituted for defendant Washington in his individual capacity.

Russell J. Luchtenburg and Robert J. Pavich, Chicago, Ill., for plaintiff.

Jonathan P. Siner, Sarah Vanderwicken, Asst. Corp. Counsel, and Judson H. Miner, Corp. Counsel of City of Chicago, Chicago, Ill., for defendants.

### MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Raymond Gamboa brings this action against defendant City of Chicago and six individual defendants. Gamboa charges that he was transferred, demoted and suspended because he is Hispanic and did not support Harold Washington in the 1983 mayoral election. The six individual defendants are Harold Washington, Mayor of the City of Chicago 1983–1987; Judith Walker, appointed Commissioner of Department of Human Services ("DHS") in May 1984; Charles Ford, Acting Director of Community Services at DHS in February 1984 and appointed to Deputy Commissioner at DHS in March or April 1985; Eugene Love, appointed Director of Emergency Services Unit at DHS on April 1, 1985; Win Humphrey, Field Supervisor of Emergency Services Program, DHS, from January 1984 to May 1985; and Jesse Hoskins, appointed Commissioner of the City of Chicago Department of Personnel on July 1, 1985.

Gamboa charges the City with violations of the First Amendment, the Equal Protection Clause (Fourteenth Amendment), racial discrimination and conspiracy, under 42 U.S.C. §§ 1981, 1983 and 1985. Defendants challenge this action and move for summary judgment on the grounds that as a matter of law the individual defendants are immune from suit and, further, that there remain no genuine issues of material fact. This court finds that there are genuine issues of material fact and, therefore, denies defendants' motion.

### FACTS

We view the facts in the light most favorable to plaintiff and herein provide an abbreviated summary.

Raymond Gamboa resides in the City of Chicago. He has been employed by the City's Department of Human Services (DHS) from May 1975 until the present. Before that, in 1973, Gamboa had worked for the City as a recreation aide during his summer break from Southern Illinois University at Carbondale. Sometime in 1983

Gamboa was appointed as the acting assistant manager of the DHS–South Chicago Community Service Center (DHS–South Chicago) and then as its acting district manager. While Gamboa's work history from the City Department of Personnel lists his title for the period 1982–1984 as "human service worker II," with the starting pay rate of $1,526 a month, the City does not dispute the fact that during this time Gamboa was appointed to two positions, acting assistant manager and acting district manager, or that he was functioning in those positions or performing those duties without a commensurate raise in salary.

Then, in January 1984, Gamboa was promoted to the position of district manager of DHS–South Chicago—grade 10 to grade 16—at the increased salary of $2,255 a month. At the time of his appointment to the position of district manager Gamboa was one of the highest ranking and highest paid Hispanics in the DHS. Also significant is the fact that during the 1983 primary campaign for mayor, Gamboa worked for the Regular Democratic Organization of the 10th Ward doing precinct work and canvassing. After Mayor Washington won the Democratic primary Gamboa worked with the 10th Ward Regular Democratic Organization, supporting Bernard Epton for Mayor.

From 1983 to 1985 DHS and the Department of Personnel conducted a series of job audits in order to properly correlate job positions and titles with the work that was actually being performed. These assessments of job functions were often, but not always, based on CS–15 forms. These forms were filled in by the employees and listed the permanent duties that those employees were actually performing. As of January 1984 Gamboa held the title of district manager of DHS–South Chicago and was performing the duties of district manager until he was removed by Charles Ford. From the end of February 1984 to the middle of March 1984, Ford transferred more than half of the management personnel at DHS (approximately 50, including Gamboa). With the exception of Gamboa, however, all of the other transfers were lateral moves and did not result in personnel performing duties of a lower title or lower grade.

On February 21, 1984, Ford transferred Gamboa temporarily to the Division of Emergency Services in the Central Office, for a special assignment, to assist the Hispanic community in taking advantage of the emergency services of DHS. Ford told Gamboa that the assignment to field supervisor was temporary and that this special project was not a demotion and that he did not intend that there be any loss in pay grade or title. At the time of his transfer, Gamboa was replaced at DHS–South Chicago by Leon Duminie, who is black. The Department of Personnel permits department heads to reassign employees so long as the reassignment maintains the same kind and quality of duties with appropriate title and salary. Because he was district manager, Gamboa had senior executive status (SES). As a result, Gamboa should have been terminated as district manager and then reemployed as a field supervisor.

Shortly after Gamboa was transferred to the Central Office there were several rallies and protests in both the 10th Ward and at City Hall to voice opposition to both the transfer and replacement of Gamboa by Duminie. When specifically questioned by the Spanish Association of the Inter–American Journalists and Broadcasters of Illinois about Gamboa's transfer and replacement by a black, Mayor Washington answered that the transfer was not a demotion and that Duminie was appointed only on an interim basis and a Hispanic would be named district manager at South Chicago. Moreover, Washington opined that the protest seemed to be localized and coming from the 10th Ward Regular Democratic Organization and not the community at large. Others who had been active with that organization had also been subjects of adverse DHS personnel actions and, in one instance, the reason given related to the employee's political activities.

In addition, in February and March 1984, per an order from Mayor Washington to the Commissioner of DHS, DHS employees were completing CS–15 forms, listing their

current duties. If the duties of the employee, as detailed on the form, differed from the duties the employee should be performing according to his or her job title, then a job audit would be done by the Department of Personnel. Gamboa was given a CS–15 form to sign which had been prepared by Mr. Pritchett at the request of Ford. This form listed Gamboa's duties as that of field supervisor. Gamboa refused to sign the form because he believed his assignment at Central Office (as a field supervisor on special assignment) to be temporary. Based on the CS–15 form, Gamboa was listed as a field supervisor and the Department of Personnel recommended he be reclassified from his position as district manager. DHS did not reclassify Gamboa in 1984 as recommended.

Approximately one year later, in February 1985, Gamboa's immediate supervisor, Win Humphrey, assigned him to work temporarily as a community intervention worker on a mobile team on the night shift, starting at 11:00 p.m. Humphrey had told Ford that he thought Gamboa needed more field experience, even though Gamboa had been performing the job of field supervisor in the emergency services unit, in charge of five or six teams, for about a year. Both Ford and Humphrey characterized this new reassignment as temporary. With no prior notice, Humphrey told Gamboa about his new reassignment at a staff meeting.

At Gamboa's request, Humphrey sent Gamboa a memo dated February 12, 1985, telling Gamboa that this temporary job reassignment and shift change was effective immediately. The memo also specified that there would be a review at the end of thirty days, on March 21, 1985. Sometime in March 1985 Judith Walker, Commissioner of DHS, announced a reorganization at a general meeting of all DHS personnel. At this meeting personnel were apprised that this reorganization included reclassifying, laying off and firing many current employees. Personnel were also advised of the procedures, including the appeal process, for any employee reclassified, laid off or fired. Gamboa attended this meeting.

Gamboa wrote a memo to Humphrey on March 29, 1985, requesting a review of his temporary reassignment. Eugene Ford had handwritten a note to Love, Director of Emergency Services, on the bottom of Gamboa's memo to Humphrey, advising her to keep Gamboa on the third shift and to speak with Humphrey, who would provide additional information. Eugene Love then wrote to Gamboa on April 29, 1985, concerning Gamboa's reassignment from district manager to field supervisor to crisis intervention worker, on the third shift, from 11:00 p.m. to 7:00 a.m. Love advised Gamboa that he would not change his shift or reassign him to a position at a managerial level, but suggested Gamboa apply for any position posted by the Personnel Office.

Sometime around April 22, 1985, Gamboa was asked to fill out a CS–15, describing his current duties as a crisis intervention worker. Gamboa refused because he believed his reassignments to be temporary. Moreover, he believed that by filling out the CS–15 for community intervention worker he would automatically be downgraded in title and pay. Furthermore, Gamboa understood that the CS–15 forms were not required of those employees in temporary assignments and, in fact, some temporarily assigned employees did not fill out CS–15 forms at this time. Then, on May 17, 1985, Gamboa did complete a CS–15 form and listed his duties as a district manager.

Shortly thereafter Love requested James Mosley, Gamboa's supervisor, to fill out a CS–15 for Gamboa, listing Gamboa's duties as that of community intervention worker. Gamboa was then suspended for one day, on June 5, 1985. Consequently, on July 1, 1985, Gamboa was reclassified from district manager, grade 16, to community intervention worker, grade 11. Gamboa insists, contrary to City policy, that while there were four vacancies for the position of district manager since his reclassification, those vacancies have never been posted in either the Department of Human Services or the Department of Personnel.

Earlier, on June 13 or 14, Gamboa received a form letter from the Department of Personnel which had been sent to all DHS employees who had been reclassified. This form letter stated each individual employee's reclassification (on blank spaces provided), and that each employee had the right to request a review of his or her reclassification within the strict timetable of Personnel Rule XXVI. The letter also contained a copy of Rule XXVI, which stated exact procedures for requesting a review of the reclassification.

Rule XXVI was applicable only to career service employees and not to SES employees like Gamboa. Gamboa, however, had attended the March 1985 general meeting where employees of DHS were told about their right to appeal any job reclassification and had, additionally, received the June 14 letter with an enclosed copy of Rule XXVI. A review held on July 11, 1985, upheld Gamboa's reclassification. Gamboa then filed an appeal on July 29, 1985.

The hearing was held on October 24, 1985 and the hearing officer recommended that the appeal be dismissed because Gamboa had no standing under Rule XXVI since he was not a career service employee. In the alternative, the hearing officer stated that even if Gamboa had standing the appeal should be dismissed because it appeared that Gamboa's duties were permanent and not temporary. The Department of Personnel dismissed Gamboa's appeal on his reclassification on February 26, 1986.

During 1985 and 1986 Gamboa was disciplined by Love for excessive absenteeism. Gamboa suffered from stress and hypertension and had brought his supervisor, Mosley, doctor's statements which justified his absences and requested that Gamboa be transferred to an earlier shift for medical reasons. Gamboa had more than adequate sick leave available and his absences were taken against his sick time. Mosley advised Gamboa that the authorization to discipline Gamboa had come from Love. Love did not accept the statements from Gamboa's doctors and suggested to Gamboa that he find employment elsewhere.

Aside from his absenteeism, Love characterized Gamboa's work performance as good to excellent. On April 29, 1985, and again on October 7, 1985, Gamboa wrote to Love requesting a change from the third shift to the first shift. Love denied both these requests, telling Gamboa that no vacancies existed and that he, Love, would or might create a lottery system for shift changes so as to be fair to all employees. This lottery system was never implemented.

As of February 18, 1986, all requests for transfers to other shifts were governed by a collective bargaining agreement. After February 13, 1986, three black DHS employees requested and were granted changes from the night shift. One employee transferred to the day shift and two employees transferred to the afternoon shift. Gamboa filed two grievances under this collective bargaining agreement, the first for post-February 1986 refusals of his shift change request, and the second for failure to post open job descriptions and vacancies in either the Department of Personnel or the Department of Human Services.

## DISCUSSION

Defendants move for summary judgment because they argue there are no issues of material fact and they are entitled to judgment as a matter of law. Specifically, they attest that (1) the position of district manager involved confidential duties and is Shakman-exempt, thereby precluding First Amendment protection; (2) no one who had decisionmaking authority knew Gamboa's political affiliations and Gamboa has not produced any evidence to establish discriminatory intent to trigger a prima facie case for a First Amendment violation; (3) Gamboa has not produced any evidence that the job actions taken against him—transfers, demotions and discipline—were politically or racially motivated since most DHS employees who were transferred and demoted or disciplined were black; and (4) all the defendants have qualified immunity from suit and are entitled to judgment as a matter of law.

Gamboa insists that (1) defendants have failed their burden of demonstrating that there are no issues of material fact; (2) summary judgment is not appropriate where there are questions of motive and intent; (3) he was transferred, demoted and disciplined because he was Hispanic and supported Jane Byrne and Bernard Epton, not Harold Washington, for mayor in 1983; (4) his transfer and demotion did not follow proper procedures as specified by the Department of Personnel; and (5) his position as district manager was protected under the Shakman consent decree entered into by defendants in June 1983. For the following reasons, defendants' motion for summary judgment is denied.

■ At the outset, defendants argue that they are entitled to summary judgment because plaintiff has failed to show evidence that would establish all fundamental elements of his claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The rule in *Celotex* clarifies the language in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), which allows the party moving for summary judgment to satisfy its burden that there exists no issue of material fact, by establishing that there is no evidence supporting the moving party's case. *Celotex,* 106 S.Ct. at 2554. Defendants correctly contend, therefore, that it is plaintiff who must establish that sufficient evidence exists with respect to the fundamental elements of his claim. We believe that plaintiff has established fundamental facts sufficient to satisfy his burden and defeat defendants' motion for summary judgment.

In any motion for summary judgment we view the facts in the light most favorable to the nonmoving party, here the plaintiff. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Furthermore, the inferences viewed in the light most favorable to the plaintiff must also be reasonable. *Hermes v. Hein,* 742 F.2d 350, 354 (7th Cir.1984). In this case the facts seem to be subject to more than one interpretation. Summary judgment is

not appropriate where there are conflicting interpretations of facts, *Hermes,* at 354, or where there are questions of motive and intent. *Johnson v. Botica,* 537 F.2d 930, 937 (7th Cir.1976).

Defendants contend that plaintiff cannot establish that the employment actions taken against him were motivated by discriminatory intent. *Village of Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). In fact, defendants assert that the evidence clearly establishes that the employment actions taken against plaintiff were not motivated by discriminatory intent. Plaintiff counters that defendants admit that they acted under color of law and that discriminatory intent may be proven by circumstantial evidence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Counts I and II are brought under 42 U.S.C. §§ 1981 and 1983. Section 1981 enforces the Thirteenth Amendment, which prohibits all racial discrimination that may deprive an individual of the equal benefit of law. *U.S. v. City of Chicago,* 549 F.2d 415, 425 (7th Cir.1977) (racial discrimination by public entities also prohibited under § 1981). In *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities may be considered "persons" for purposes of § 1983 and may be liable for constitutional violations caused by official policies and customs. *See also Strauss v. City of Chicago,* 760 F.2d 765 (7th Cir.1985).

Defendants argue that there is no evidence in the record to suggest that Hispanics were more adversely affected by their employment decisions, that there was no racial motivation in defendants' employment decisions to reorganize the DHS, that they had never said anything to plaintiff that would indicate discriminatory intent and that they acted properly, in the normal

course of business, in their dealings with plaintiff. The argument continues that plaintiff was merely one of a great many people whose employment with the City was affected by the reorganization and that he was disciplined solely because he refused to cooperate with defendants.

In opposition, plaintiff maintains that the record establishes circumstantial proof that defendants' assignments and transfers after February 20, 1984, were racially motivated. *See Flowers v. Crouch–Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir.1977) (showing of satisfactory job performance essential to establish inference of racial discrimination in the firing of a minority); *De Lesstine v. Fort Wayne State Hospital*, 682 F.2d 130, 133 (7th Cir.1982) (employer cannot be immunized from specific acts of racial discrimination by replacing employee with individual of same race).

■ In order for plaintiff to prevail on counts I and II he must establish that his constitutional rights were violated by an official policy or custom, and that he was injured as a result of this policy *Strauss*, at 767. Plaintiff must point to facts which tend to support these allegations. *Id.* at 769. Further, at least with respect to his § 1981 claim, plaintiff cannot recover for discipline or harassment not amounting to a demotion or a constructive discharge, *Patterson v. McLean Credit Union*, ── U.S. ──, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) although evidence of improper discipline and harassment may be relevant to his cognizable claims.

There is no disagreement here that defendants were acting under a City personnel policy and a policy to reorganize the DHS, nor is there disagreement that plaintiff suffered an injury (transfers, demotion and discipline). The argument turns on whether these employment actions were motivated by discriminatory intent.

Defendants argue that there is no evidence of discrimination because a Hispanic was appointed to replace plaintiff as district manager of South Chicago (Duminie, a black, held the position temporarily for only an interim period of two to three weeks), and plaintiff was allowed to retain his salary and title of district manager, even though he was transferred to a job position with a lower grade and salary. Moreover, plaintiff was reclassified along with hundreds of others in the DHS to a lower grade and salary, and he was afforded a full and fair hearing of his reclassification. Defendants contend that even if plaintiff was not reassigned for good cause, this arbitrary or even erroneous job decision is not by itself a "pretext" for discrimination. *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir. 1987). An employer is not liable under § 1981 or § 1983 for an arbitrary or erroneous decision. *Friedel v. City of Madison*, 832 F.2d 965, 973 (7th Cir.1987).

The test here is whether there is any evidence of discrimination of plaintiff based on his race. *Id.* at 974. Plaintiff asserts that there is. He maintains that an Hispanic was appointed to replace him only after the Hispanic community demonstrated on his and other transferred or fired Hispanic City employees' behalf. Further, plaintiff contends that he alone was transferred to lesser duties in March 1984 and that all other individuals transferred in March 1984 were not assigned duties of a lower title and grade. Plaintiff also insists that he was the only field supervisor to ever be transferred or reassigned to community intervention worker for more experience.

There is evidence to suggest that plaintiff's transfer and reassignment in both 1984 and 1985 were temporary but that despite repeated requests by plaintiff no reassessment ever took place. In addition, plaintiff claims that he was denied repeated shift change requests and at the same time three black DHS employees were granted shift changes.

According to defendants, plaintiff was afforded a full and fair hearing on his appeal of his reclassification in July 1985. The hearing officer recommended that the plaintiff's appeal be dismissed because he had no standing to appeal since his prior classification, district manager, did not confer career service status and further recommended that the reclassification be up-

held if Gamboa had standing, since he then was (and all parties agreed he in fact was) performing the duties of a community intervention worker on a continuing, not a temporary, basis, even though plaintiff believed it should have been temporary and considered as temporary. That decision was not appealed.

Defendants contend that because plaintiff was an SES employee they could simply have laid him off in July of 1985 and then reappointed him to the lower title and grade position. (According to City personnel procedures plaintiff should also have been fired by defendants in 1984 from his position as district manager and then reappointed to his position as field supervisor. Presumably this is the reason plaintiff retained his title and salary of district manager, contrary to the recommendation of the City personnel department, when he was temporarily transferred to his position at Central Office.)

■ Defendants portray as ludicrous plaintiff's assertion that he was subject to racial discrimination when he was afforded a hearing under Rule XXVI because defendants knew that plaintiff was not entitled to the hearing. Moreover, defendants argue that plaintiff is precluded from claiming racial discrimination since those claims could have been brought before the administrative hearing, which should be given *res judicata* and/or collateral estoppel effect. *White v. Elrod,* 816 F.2d 1172, 1174 (7th Cir.1987).

The only support for the contention that plaintiff could have raised constitutional claims in the reclassification proceeding is the defendants' bare assertion. That procedure appears not to be concerned with "cause" issues but only with the narrow issue of proper classification: what are a career service employee's actual and continuing duties and therefore what is his proper job classification. Further, it is difficult to see how plaintiff's claims could be foreclosed by an agency that decided it had no jurisdiction to decide. In any event, the claims were not litigated, there were no factual findings relevant to the claims here and there was no appeal to a state court,

and Gamboa could, therefore, pursue his civil rights claims in federal court. *Button v. Harden,* 814 F.2d 382 (7th Cir.1987).

■ We have previously stated that the facts recited here are an abbreviated summary. There is no smoking gun. Plaintiff relies upon a mosaic of facts from which, he argues, a conclusion that the defendants were racially motivated emerges. Defendant provides, point-by-point, alternate explanations in what has been extensive briefing by both plaintiff and the defendants. Perhaps the defendants are correct in their contentions. But determining that there is not a pattern in the mosaic solely on the basis of a cold record is beyond the capacity of that record to persuade. When viewed in the light most favorable to plaintiff, the reasonable inferences of the facts do not establish beyond reasonable dispute that plaintiff cannot establish by circumstantial evidence that the employment actions by defendants (plaintiff's transfers, demotions and disciplines) were racially motivated. *See McDonnell Douglas, supra.* It is up to the trier of fact to decide the outcome. Summary judgment is therefore denied for counts I and II.

Count III asserts that defendants violated 42 U.S.C. § 1985(3), the conspiracy statute (a conspiracy prompted by racial considerations). For the reasons discussed above, summary judgment is denied for count III.

■ Plaintiff charges in count IV that defendants violated his First Amendment rights of freedom of speech and association. Defendants argue that even if plaintiff can establish that his transfers, demotions and disciplines were motivated by political concerns, the position of district manager involves confidential duties which are exempt from First Amendment protection.

In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court determined that a patronage dismissal was not unconstitutional if political affiliation was a legitimate requirement for the effective performance of the particular position. *Id.* at 518, 100 S.Ct. at 1294. The Seventh Circuit requires that we look

to the "position, not the duties performed" in order to decide whether a plaintiff is exempt from First Amendment protection. *Tomczak v. City of Chicago*, 765 F.2d 633, 642 (7th Cir.1985). In *Tomczak*, the Seventh Circuit looked to the fact that plaintiff there held a high position (second highest job in a large city department), had an annual salary of $62,000 a year (the second highest in the department), and was in a position where he spent 30% of his time formulating budget requirements and 10% coordinating short- and long-range goals, before determining that plaintiff's position was not protected by the First Amendment. Defendants cite *Tomczak* and ask this court to look at plaintiff's position and not his actual duties in order to determine whether or not plaintiff's position was protected by the First Amendment.

The test focuses on the powers of the office, that is, does the position authorize the individual to give "meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). Plaintiff's position is clearly unlike the plaintiff in *Tomczak*.

Defendants argue that plaintiff "always held the *title* of district manager until he was reclassified to a community intervention worker in July of 1985. Thus the *function* of job title as district manager remained the same. Whatever actual duties plaintiff may have performed [is] irrelevant" (mo. for sum. jdgt. at 20). Defendants argue that the functions of district manager necessitate a confidential employee who will carry out the policies of the administration. But an individual defendant testified to the contrary, that the position of district manager was protected under *Shakman v. Democratic Party Organization of Cook County*, 569 F.Supp. 177 (N.D.Ill.1983).[2] Further, the confidential employee concept does not help defendants with respect to adverse actions taken after plaintiff's reclassification.

Additionally, defendants cite *Rutan v. Republican Party of Illinois*, 868 F.2d 943 (7th Cir.1989). In *Rutan* the Seventh Circuit dealt with five plaintiffs. Some had been denied promotions or had been transferred, some had been laid off or had not been rehired after being laid off, and all claimed they were denied employment as a result of political patronage. The court followed the restrictive standard set by the Fourth Circuit in *Delong v. U.S.*, 621 F.2d 618 (4th Cir.1980), which limited an employee's challenge of patronage practices to those that can be determined to be "the substantial equivalent of dismissal." *Id.* at 624. It concluded that a First Amendment violation occurs only when an employment action is the equivalent of a discharge, but, in reversing all but one of the dismissals, it emphasized the factual nature of the issues—would a reasonable person faced with those specific circumstances have quit. The facts and circumstances of each case determine whether a specific employment action is the "substantial equivalent of dismissal." *Id.* We cannot say that a reasonable trier of fact could not conclude that a reasonable person who went from a well-paid managerial position to a far less remunerative field position on the night shift would not quit.

---

**2.** Plaintiff contends that the position of district manager is not a confidential or policymaking one and that the position of district manager is protected by the Shakman consent decree, *Shakman v. Democratic Organization of Cook County*, at 177. Under *Shakman*, 21 positions are listed as exempt under the Department of Human Services. The specific position of district manager is not listed. *Id.* at 197. Nor is district manager listed as an exempt position under any department. *Id.* at 191–203. Defendants assert that there were nine positions at DHS and that "district manager" was another name for the seven exempt positions listed under Director of Urban Progress Center and that plaintiff's position was one of two which was listed as Shakman-exempt. No other evidence is offered to substantiate this claim. In fact, defendants seem to agree that there is a factual dispute here as to whether plaintiff's position as district manager is in fact Shakman-exempt, by arguing that individual defendants are immune from First Amendment liability because it is not clear whether district manager is a confidential policymaking position that would permit a specific political affiliation (reply to mo. for sum. jdgt. at 13).

Clearly there are factual disputes here. The trier of fact must decide whether plaintiff is a confidential employee in a policy-making position exempt from First Amendment protection under the *Elrod* standard, whether political affiliation was a proper requirement for plaintiff's effective job performance under the *Branti* standard, and therefore exempt from First Amendment protection, and whether plaintiff's transfers, demotions and disciplines were the "substantial equivalent of discharge" under the *Rutan* standard, thus giving plaintiff First Amendment protection.

Defendants also argue that plaintiff cannot prove that his political activities and/or affiliations were substantial or motivating factors in his transfers, demotions and discipline. *Mount Healthy City School Dist. Board of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Moreover, defendants claim that the record establishes that they would have taken the same job actions against plaintiff "even in the absence of the protected conduct." *Id.* at 287, 97 S.Ct. at 576.

We disagree. The record suggests that plaintiff's transfers, demotions and disciplines were unusual. He was not discharged from his position as district manager and rehired as a field supervisor, contrary to personnel policy. He was temporarily transferred but never reassessed. He retained his title and salary as district manager for a time, even though the City personnel department recommended that he be downgraded. He was incorrectly given a Rule XXVI hearing for career service employees, even though he was a SES employee and not entitled to a hearing.

Plaintiff offers evidence that defendants' actions were motivated by his political activities and/or affiliations. When plaintiff was initially transferred from his duties as district manager of South Chicago, there were various demonstrations in the 10th Ward. Within a few weeks of plaintiff's transfer, Mayor Washington held a press conference with the Hispanic media. The transcript of that press conference shows that Mayor Washington was aware of the concerns of the Hispanic community about plaintiff's transfer and characterized the demonstrations as small and localized, coming from the 10th Ward Democratic Organization headed by Edward Vrdolyak, one of the Mayor's chief rivals.

In order to prevail plaintiff must eventually show more than mere membership in an opposition party or faction. *Nekolny*, at 1168. As defendants point out, hearsay evidence or unsupported evidence cannot be considered in a summary judgment motion. *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir.1977), *Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 414 (N.D.Ill. 1984). The record here indicates more than merely adverse job actions or hearsay or unsupported evidence with respect to plaintiff's political activities and/or affiliation. There is testimony that other City employees who were members of the 10th Ward Organization also suffered adverse job actions. There is certainly a question here as to whether plaintiff's political activities and/or affiliations were known by the new City administration and, if so, what effect that had on plaintiff's transfers, demotions and disciplines.

In order for plaintiff to prevail against the City under 42 U.S.C. § 1983, plaintiff must show that defendant lawfully pursued a policy of the City which deprived plaintiff of federal rights, *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036, or that a person with final decisionmaking authority established policy with respect to the specific adverse job actions ordered here. *Pembaur v. Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). The Supreme Court has recently held that discretionary decisions made by a subordinate do not necessarily delegate to them policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). However, if an employment policy was set by the Mayor, that policy would provide the basis for municipal liability even if subordinates carried out that policy. *Id.* 108 S.Ct. at 927. "If the authorized policymaker approves a subordinates decision and the basis for it, then ratification would be chargeable to the municipality because their decision is final." *Id.* 108 S.Ct. at 926.

Whether Mayor Washington or his department heads or supervisors approved the adverse job actions against plaintiff because of his political activities and/or affiliations, or because he is Hispanic, is central to this lawsuit. Here, we must view all reasonable inferences from the facts in the light most favorable to plaintiff. *See Hermes, supra.* For the reasons previously discussed, we conclude that there are genuine issues of disputed material facts and that defendants are not entitled to judgment on the issue of municipal liability as a matter of law.

■ Finally, defendants claim qualified immunity exonerates them as individuals, and it is here, with respect to the First Amendment claims, that defendants have the most persuasive contention. Qualified immunity is an issue of law. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). Government officials, as individuals, are immune from liability when they are performing discretionary functions, so long as their conduct does not violate "clearly established" law "of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). For purposes of a motion for summary judgment, the court may determine whether the law was in fact clearly established at the time of the challenged conduct. *Id.* The standard here is objective reasonableness. *Id.* Because the standard is objective, it is also fact-specific. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). Qualified immunity depends on the specific conduct of the individual defendants and the district court must look to all the evidence to determine precisely what that specific conduct was. *Green v. Carlson,* 826 F.2d 647, 651 (7th Cir.1987).

Plaintiff was first transferred from his position of district manager of South Chicago in February 1984. A lateral transfer, with no loss of salary or rank, under the same working conditions, was not "clearly established" as being constitutionally impermissible with respect to political considerations. *Cygnar v. City of Chicago,* 652 F.Supp. 287, 297 (N.D.Ill.1986). At a minimum, however, it was clearly established in 1985 that a politically motivated constructive discharge was actionable.

■ A key question remains whether or not plaintiff was a confidential employee. If he was, then plaintiff's transfer was not unlawful. Defendants argue that assuming *arguendo* the position of district manager has not been clearly established as confidential and exempt from First Amendment protection, then they are immune from liability because of the dispute. On that they may well be right, and we recognize that a qualified immunity defense should be determined, if possible, short of trial. But the reason for that is that the official should not have to be put to the expense and difficulties of trial unnecessarily, and here there is going to be a trial in any event. Further, this was one of the few issues not extensively briefed.

The Seventh Circuit has concluded that when, as here, a claim of qualified immunity is part of a motion for summary judgment, the court must look to the undisputed evidence in the light most favorable to the plaintiff. *Green* at 652. If those undisputed facts establish as a matter of law that defendants' conduct did not violate clearly-established law, defendants are entitled to qualified immunity. "However, if there are issues of disputed fact upon which the question of immunity turns, or if it is clear that the defendant's conduct did violate clearly established norms, the case must proceed to trial." *Id.*

The question of qualified immunity here is a close one, but we do not believe that the present record clearly establishes that the district manager position reasonably could be viewed as a confidential position— or at least the issue is sufficiently in doubt to preclude summary judgment on qualified immunity grounds when the defendants must try the other issues in any event.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied.